IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

MARTIN J. WALSH,
Secretary of Labor, United States
Department of Labor,

   Plaintiff,

v.           Case No. 3:20-CV-01284-NJR

SALINE COUNTY AMBULANCE
SERVICE, INC., WILLIAMSON
COUNTY AMBULANCE SERVICE,
INC., and RICK L. COLYER,

   Defendants.

# MEMORANDUM AND ORDER

**ROSENSTENGEL, Chief Judge:**

This matter is before the Court on a Motion for Summary Judgment filed by Plaintiff Martin J. Walsh, Secretary of Labor for the United States Department of Labor ("DOL"). (Doc. 30). Defendants filed a response in opposition (Doc. 42), and DOL filed a timely reply. (Doc. 46). For the reasons set forth below, the motion is granted in part and denied in part.

## FACTS

Saline County Ambulance Service, Inc. ("SCAS")[1] and Williamson County Ambulance Service, Inc. ("WCAS") provided ambulance services to Saline and Williamson Counties in southern Illinois. (Doc. 31, p. 1). From December 1, 2017, to December 30, 2020, SCAS and WCAS engaged in commerce and had a combined annual

---

[1] SCAS was in business until August 2021. (Doc. 32-1, p. 8).

gross volume of business exceeding $500,000. (Doc. 23). Both SCAS and WCAS operated 24 hours a day, seven days a week. (Doc. 32-1, pp. 26-29).

SCAS and WCAS employed dispatchers, EMTs, and paramedics. (Docs. 32-10; 32-11). Dispatchers, EMTs, and paramedics typically worked 24-hour shifts. (Doc. 32-1, pp. 37, 39; Doc. 34-21, p. 3; Doc. 34-22, p. 2; Doc. 43, p. 9). Employees of SCAS and WCAS were paid a salary or a shift rate per pay period. (Doc. 32-1, pp. 17-22; Doc. 44-2, p. 41; Docs. 33-1–33-13; Docs. 34-1–34-11).

The sole owner and president of SCAS and WCAS, Rick Colyer ("Colyer"), set schedules and pay rates and did payroll. (Doc. 32-1, pp. 10-12, 23-24, 31). Colyer "figured" an employee's hourly rate of pay based on the employee's salary or shift rate. (Doc. 32-1, pp. 17-22). Colyer did not keep a list of employees' hourly rates; instead, he recorded the rates on timesheets after he "figured it." (Doc. 32-3, p. 33). For instance, "[i]f someone was required to make say $600 per week and they worked a certain amount of hours, [Colyer] would divide those hours into that number to get an hourly rate." (Doc. 44-2, p. 41).

### The Late 1990s Investigation

In the late 1990s, DOL's Wage and Hour Division ("WHD") investigated SCAS and WCAS's pay practices. (Doc. 32-3, p. 16; Doc. 34-14, p. 9; Doc. 44-2, pp. 47-52). According to Colyer, he was told to pay a minimum of 13 hours per shift, but to add to the time per shift for sleep time interruptions. (Doc. 32-3, p. 19; Doc. 44-2, p. 49-52). This investigation resulted in a consent judgment. (Doc. 34-16). SCAS and WCAS agreed to pay $20,000 in minimum wage and overtime compensation due to employees for the period of March 1, 1996, to November 26, 1999. (*Id*. at p. 4). Defendants were also enjoined

from violating the minimum wage, overtime, and recordkeeping provisions of the Fair Labor Standards Act ("FLSA"). (*Id.* at p. 3). After the consent agreement, Colyer requested further information on how employees should record time, and WHD Investigator Jim Yochim ("Yochim") provided a letter to Colyer at his request. (Doc. 44-2, pp. 51-52; Doc. 34-17).

*The Current Investigation*

In January 2019, WHD again investigated WCAS and SCAS's pay practices. (Doc. 34-14). Investigator Matthew Carlen had a conference with Colyer, gathered and reviewed documents and records, and interviewed employees. (*Id.*). The investigation uncovered Defendants' failure to record accurate start and stop times—and sleep time interruptions. (*Id.*). Investigator Carlen determined that Defendants' payment practices resulted in minimum wage and overtime violations. (*Id.*).

As a result, DOL filed this action on December 1, 2020 (Doc. 1) and is proceeding on three claims:  violation of Section 6 of the FLSA – Paying Employees Less than $7.25 per hour; violation of Section 7 of the FLSA – Failing to Properly Compensate Employees for Overtime; and violation of Section 11(c) of the FLSA – Recordkeeping Violations. DOL also seeks an order permanently enjoining and restraining Defendants from prospectively violating the FLSA. (Doc. 1, p. 5). The Court has federal question subject matter jurisdiction over the FLSA claims.

LEGAL STANDARD

Summary judgment is only appropriate if the movant "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Spurling v. C & M Fine Pack, Inc.*, 739 F.3d 1055, 1060 (7th Cir. 2014) (quoting FED. R. CIV. P. 56(a)). Once the moving party sets forth the basis for summary judgment, the burden then shifts to the nonmoving party who must go beyond mere allegations and offer specific facts showing that there is a genuine issue of fact for trial. FED. R. CIV. P. 56(e); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 232-24 (1986). The nonmoving party must offer more than "[c]onclusory allegations, unsupported by specific facts," to establish a genuine issue of material fact. *Payne v. Pauley*, 337 F.3d 767, 773 (7th Cir. 2003) (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990)).

In determining whether a genuine issue of fact exists, the Court must view the evidence and draw all reasonable inferences in favor of the party opposing the motion. *Bennington v. Caterpillar Inc.*, 275 F.3d 654, 658 (7th Cir. 2001). However, "[i]nferences that rely upon speculation or conjecture are insufficient." *Armato v. Grounds*, 766 F.3d 713, 719 (7th Cir. 2014). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Id.* (citation omitted).

DISCUSSION

I.    **Single Enterprise and Joint and Several Liability**

For the FLSA's minimum wage, overtime, and recordkeeping provisions to apply to Defendants, the organization must be an "enterprise engaged in commerce or in the

production of goods for commerce." 29 U.S.C. §§ 203(r), (s)(1)(A). Separate entities are a single enterprise when they are (1) engaged in related activities; (2) performed through unified operation or common control; and (3) for a common business purpose. 29 U.S.C. § 203(r)(1). Defendants admit that SCAS and WCAS constitute a single enterprise within the meaning of the statute. (Doc. 23, p. 3).

Under 29 U.S.C. § 203(d), individual liability exists for "any person acting directly or indirectly in the interest of an employer in relation to an employee[.]" *See also Riordan v. Kempiners*, 831 F.2d 690, 694 (7th Cir. 1987) (acknowledging that "[t]he word 'employer' is defined broadly enough in the Fair Labor Standards Act . . . to permit naming another employee rather than the employer as defendant, provided the defendant had supervisory authority over the complaining employee and was responsible in whole or part for the alleged violation"). Defendants admit that Colyer is an "employer" under the FLSA. (Doc. 23). Accordingly, Colyer is individually liable and jointly and severally liable with SCAS and WCAS. *See Poff v. Quick Pick, LLC*, 2017 WL 4284749, at *2 (S.D. Ind. Sept. 27, 2017) (noting that "[i]t has been consistently recognized by the district courts of this circuit that a corporate officer with operational control over an employee is considered an employer together with the corporation, jointly and severally liable for unpaid wages under the FLSA"); *see, e.g.*, *Natal v. Medistar, Inc.*, 221 F.Supp.3d 999, 1003 (N.D. Ill. 2016); *Arteaga v. Lynch*, 2013 WL 5408580, at *12 (N.D. Ill. Sept. 26, 2013) ("[c]ourts evaluating FLSA claims have imposed liability on individuals in a range of corporate positions, including general managers, provided such individuals acted on behalf of the corporation to cause the violations"); *Kelley v. Stevens Auto Sales*, 2009 WL 2762765, at *3

(N.D. Ind. Aug. 27, 2009) ("[w]hile the Court has not located a Seventh Circuit Court of Appeals case directly on point, the district courts of this circuit have consistently recognized that a corporate officer with operational control over an employee is an employer along with the corporation, jointly and severally liable under the FLSA for unpaid wages").

## II. Defendants' Recordkeeping

The FLSA requires employers to make, keep, and preserve records of employees' wages, hours and other conditions and practices of employment. 29 U.S.C. § 211(c). Every employer must maintain and preserve payroll or other records containing each employees' daily hours, weekly hours, regular rates of pay, total daily or weekly straight time earnings, and total overtime earnings per workweek. 29 C.F.R. § 516.2(a)(1)-(12). "The FLSA makes clear that employers, not employees, bear the ultimate responsibility for ensuring that employee time sheets are an accurate record of all hours worked by employees." *Skelton v. Am. Intercontinental Univ. Online*, 382 F.Supp.2d 1068, 1071 (N.D. Ill. 2005); *see also Walton v. United Consumers Club, Inc.*, 786 F.2d 303, 314 (7th Cir. 1986) (noting that "[s]ection 11(c) of the FLSA, 29 U.S.C. § 211(c), requires every employer to keep an accurate record of the hours worked by each employee").

DOL asserts that "Defendants grossly failed to maintain records required by law." (Doc. 31, p. 9). According to the DOL, "Defendants' pay records prior to 2021 did not include the regular rate of pay, straight time earnings, or overtime earnings." (*Id.*). Defendants do not dispute the evidence regarding their poor recordkeeping. Indeed,

Defendants admit that sleep time interruptions were not recorded. (Doc. 32-1, p. 54).[2] Numerous timesheets do not even exist for seventeen WCAS employees and ten SCAS employees. (Docs. 34-12; 34-13).

The lack of recordkeeping here is significant because "[a]n employee who brings suit pursuant to FLSA 'has the burden of proving that he performed work for which he was not properly compensated.'" *Melton v. Tippecanoe Cnty.*, 838 F.3d 814, 818 (7th Cir. 2016) (quoting *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 686–87 (1946)). "Where the employee alleges that his employer kept inaccurate records, he 'has carried out his burden if he proves that he has in fact performed work for which he was improperly compensated and if he produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference.'" *Id.* (quoting *Anderson*, 328 U.S. at 687). "At that point, '[t]he burden then shifts to the employer to come forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from the employee's evidence.'" *Id.* (quoting *Anderson*, 328 U.S. at 687-88).

Because a reasonable factfinder could find that Defendants' records did not reflect all of their employees' overtime work, DOL is only required to "produce sufficient evidence to show the amount and extent of [their] work as a matter of just and reasonable

---

[2] "Where an employee is required to be on duty for 24 hours or more, the employer and the employee may agree to exclude bona fide meal periods and a bona fide regularly scheduled sleeping period of not more than 8 hours from hours worked, provided adequate sleeping facilities are furnished by the employer and the employee can usually enjoy an uninterrupted night's sleep." 29 C.F.R. § 785.22. However, "[i]f the sleeping period is interrupted by a call to duty, the interruption must be counted as hours worked." *Id.* "For enforcement purposes, the Divisions have adopted the rule that if the employee cannot get at least 5 hours' sleep during the scheduled period the entire time is working time." *Id.*

inference." *Turner v. The Saloon, Ltd.*, 595 F.3d 679, 691 (7th Cir. 2010) (quoting *Anderson*, 328 U.S. at 686–87).

### III. Overtime Pay

**A. Liability as to Failing to Compensate for Sleep Interruptions and Failing to Properly Count & Compensate Hours Worked**

Section 7 of the FLSA requires employers to pay non-exempt employees one and one-half times their regular rates for hours worked in excess of 40 in a workweek. 29 U.S.C. § 207. Employers are not required to compensate their employees on an hourly basis, but "the overtime compensation due to employees must be computed on the basis of the hourly rate derived therefrom, and therefore, it is necessary to compute the regular hourly rate of such employees during each workweek." 29 C.F.R. § 778.109. When determining an employee's regular rate, "the employer must total *all* remuneration paid to the employee in a workweek and divide that number by the total number of hours the employee worked that week." (Doc. 31, p. 10) (citing 29 C.F.R. § 778.109; 29 C.F.R. § 778.315).

Here, DOL produced evidence showing that Defendants (1) paid a salary or shift rate to their employees; and (2) created a scheme to avoid FLSA's overtime requirements. The evidence includes:

(1) all of the available payroll records for each employee;

(2) emergency call records serviced by WCAS and SCAS from Williamson County Sheriff's Office, Williamson County 911, and Saline County 911 for the years 2017, 2018, and 2019; and

(3) Colyer's own testimony regarding his payment practices, record keeping, and recollection of employees.

i.  *Available Payroll Records from December 1, 2017 through December 31, 2020*

DOL provides the payroll records available for each employee it alleges is owed back wages. These payroll records include employees' timesheets or Colyer's post-it notes. (Docs. 33-1–34-11). The timesheets and post-it notes show when Defendants' employees worked 24-hour shifts, the hours deducted from the 24-hour shifts, and the number of shifts worked per week. (Docs. 33-1–34-11; Doc. 34-14, p. 8).[3] DOL used available timesheets "for purposes of determining the number of shifts worked per week." (Doc. 31, p. 18).

ii.  *911 Call Records for 2017, 2018, & 2019*

DOL then points to records for emergency calls serviced by WCAS and SCAS from Williamson County Sheriff's Office, Williamson County 911, and Saline County 911 for the years 2017, 2018, and 2019. (Docs. 32-4–32-9). The 911 records are used to determine the average sleep time interruptions. (Doc. 31, p. 18; Doc. 34-14). Thus, "[t]o arrive at the number of hours worked, [Investigator] Carlen used 911 records to determine the average sleep time interruptions and deducted a sleep time credit from each 24-hour shift." (*Id*.).

iii.  *Colyer's Testimony*

DOL also provides Colyer's testimony regarding his payment practices, record keeping, and recollection of employees to show the work the employees performed for which they were not properly compensated. For instance, Colyer testified that Allerding was "working three 24-hour shifts and then we changed that back down to the daytime."

---

[3] Scott Allerding's available timesheets only show that he worked four 10-hour shifts per week. (Doc. 34-1). From December 2017 to November 2019, Linda Valleroy's timesheets have an 8:00 a.m. start time, but do not show when she stopped working. (Doc. 33-10, pp. 5-40).

(Doc. 44-3, p. 20). Without Colyer's testimony, Allerding's available timesheets from December 1, 2017, through December 31, 2020, only show that he worked four 10-hour shifts per week. (Doc. 34-1).

As for Burford, Colyer notes he was paid less per hour than Cummins because Burford worked more hours than Cummins "so his overtime rate is, you know, 18, $19 an hour." (Doc. 44-1, p. 20). This testimony supports DOL's allegation that Defendants created artificial hourly rates because employees who worked more overtime were paid a lower hourly rate than other employees working fewer shifts.

Colyer's testimony for other employees confirms his practice of paying a salary or shift rate work. For instance, Colyer testified that he paid Valleroy a salary of $450 per week and Heckler a salary or shift rate of $1,600 per pay period. (*Id.* at p. 30; Doc. 44-3, p. 33). As for Carter, Vinyard, Kaczynski, Lentz, Boner, and Heckler, Colyer confirmed they were paid for less than 24 hours per shift. (Doc. 44-1, pp. 83, 86; Doc. 44-2, pp. 86-88; Doc. 44-3, pp. 26, 33-35). Colyer explained he did not pay some employees for a full 24 hours because "they picked up a lot of extra monies for the St. Louis trips where they actually made more than getting paid 16 hours." (Doc. 44-2, p. 88). For other employees, Colyer did not pay them for a full 24 hours because he only would pay them the amount of hours necessary to "at least match what they were making with their [previous] employer." (*Id.* at pp. 88-89).

### iv.  Defendants' Arguments

Because DOL provided sufficient evidence, the burden shifts to Defendants "to come forward with evidence of the precise amount of work performed or with evidence

to negative the reasonableness of the inference to be drawn from the employee's evidence.'" *Melton*, 838 F.3d at 818 (quoting *Anderson*, 328 U.S. at 687-88). Rather than introducing evidence to undercut DOL's claims, Defendants contend that DOL mischaracterizes testimony and references inadmissible hearsay. As explained below, however, Defendants fail to meet their burden.

### 1. *DOL's Characterization of Allerding's Pay*

Defendants argue that DOL's characterization of Allerding's pay is misleading. (Doc. 43, p. 2). According to Defendants, "DOL mischaracterizes the arrangement and disregards Colyer's testimony that he and Allerding agreed to a change in Allerding's hours with no change in gross weekly pay due to a change in the minimum wage." (*Id*.). The problem is Colyer's testimony is clear. Allerding was working back in 2017, and "[h]e was working three 24-hour shifts and then we changed that back down to the daytime." (Doc. 44-3, p. 20). Colyer's testimony is specific as to how many hours Allerding worked from December 1, 2017, until June 2018, and Defendants have not pointed to anything in the record that negates DOL's evidence of Allerding's claims.

### 2. *Declaration of Investigator Carlen*

Defendants contend that "[t]he Declaration of Investigator Carlen contains numerous references to hearsay." (Doc. 43, p. 2). Defendants note that "DOL asserts in its Motion for Summary Judgment that Colyer's employees did not understand how they were being paid (SJ Motion p. 3) and supported that assertion with hearsay examples of what Investigator Carlen was allegedly told by some of Colyer's employees." (*Id*.).

The Court fails to see how this argument negates the reasonableness of the inference to be drawn from DOL's evidence. Even if this argument relates to the overtime claim, the employees' statements recounted in Investigator Carlen's declaration do not constitute hearsay. Under Federal Rule of Evidence 801(d)(2)(D), a statement is not hearsay when it is offered against an opposing party and "was made by the party's agent or employee on a matter within the scope of that relationship and while it existed." Here, DOL offers the statements recounted in Investigator Carlen's declaration against Defendants, and they were made by Defendants' own employees regarding wages, hours, sleep time, and overtime—which are within the scope of the existing employee-employer relationship. *See Scalia v. Ghosn*, 451 F. Supp. 3d 1215, 1221 (W.D. Okla. 2020) (noting that "these statements are not hearsay pursuant to FED. R. EVID. 801(d)(2)(D) because Plaintiff offers them against Defendants and they were made by Defendants' own employees on matters like wages and breaks, which are within the scope of the employee-employer relationship while it existed").

### 3. *Accuracy of the 911 Records*

Defendants also challenge "[w]hether the times listed for call outs in the 911 records referenced in the Plaintiff's motion are accurate." (Doc. 43, p. 4). Defendants point to Colyer's testimony "that the 911 records were not always accurate and they did not necessarily reflect actual time spent on a call as the 911 dispatchers were often swamped." (*Id*.). Colyer's testimony includes:

> **Q:** So within Saline County, what areas did you typically cover when Saline was still operating?

**Colyer:** The Harrisburg area.

**Q.** The Harrisburg area. Okay. It looks like this activity report it records the calls coming in, the nature of the call, the time the call was received, when the call was dispatched, en route, on scene, transport, arrive, and available. And I take available means the call is done and the ambulance truck is available to be dispatched again.

If we look at like—let's see. Like this page, there was an EMS call on January 12th, 2018. This is the last entry on the page. I'm trying to highlight it. We're looking at DOL110, I believe, and 114 is the page number. So this was a call that came into Saline. It looks like the call came in at 7:56 a.m. and then the crew was available at 8:19 a.m. So if this came in to Saline, the crew who responded to this call, they would have had to stay at least 19 minutes over their scheduled end time, correct?

**Colyer:** *If that was our call. I don't know for sure.* You're putting our calls with somebody else. Like I said, they're really busy up there. I know it's not a real accurate system that they have. I don't *think* it's a real reliable source. *It's my opinion.* They do the best they can. They're really swamped.

(Doc. 44-1, pp. 129-130) (emphasis added).

This testimony is insufficient to carry Defendants' burden as it is neither based on personal knowledge nor grounded in observation. *See Whitlock v. Brown*, 596 F.3d 406, 411 (7th Cir. 2010) (acknowledging that while "'self-serving' deposition testimony may satisfy a party's evidentiary burden on summary judgment . . . the sufficiency of a 'self-serving' statement depends on whether the statement is based on personal knowledge and whether it is grounded in observation as opposed to mere speculation."). Colyer's testimony fails to establish his personal knowledge of the accuracy of the 911 records as Colyer later testified that he "[does] [not] know anything about the dispatch report." (*Id.* at pp. 130-131). Colyer admitted that he "never receive[d] those, that information from Saline County." (*Id.* at p. 131). Colyer then guessed the reports were compiled because

the DOL requested them, "but [he] never received those reports." (*Id.*); *see Payne*, 337 F.3d at 772 ("although personal knowledge may include reasonable inferences, those inferences must be 'grounded in observation or other first-hand personal experience [and] [t]hey must not be flights of fancy, speculations, hunches, intuitions, or rumors about matters remote from that experience'") (quoting *Visser v. Packer Eng'g Assocs., Inc.*, 924 F.2d 655, 659 (7th Cir. 1991)).

### 4. *Employees Worked Consecutive 24-Hour Shifts*

Next, Defendants argue that "[m]any of the employees worked consecutive 24 hour shifts such that a call out before 8 a.m. that continues until after 8 a.m. could well be a call answered by an employee who remains on duty, as opposed to an employee whose shift was to end at 8 a.m." (Doc. 43, p. 4). Defendants use Jon Heckler's schedule as an example by noting that he usually worked Monday, Tuesday, and Wednesday. "Thus, any callout around 8 a.m. on Tuesday or Wednesday would simply have gone into another shift for which Heckler was on duty." (*Id.*). Defendants also use Arthur Kaczynski's schedule to support their argument and note that he worked Thursday, Friday, Saturday, and Sunday. "Thus, any callout around 8 a.m. on Friday, Saturday or Sunday would simply be a continuation of work on a shift for which Kaczynski was on duty." (*Id.*).

The problem is this argument attacks the 911 records as if DOL is seeking post-shift work, but DOL is only using "the 911 records to determine the average sleep time interruptions and [then] deduct[ing] a sleep time credit from each 24-hour shift." (Doc. 31, p. 18). DOL even concedes that while 911 records support uncompensated post-

shift work, "there was insufficient evidence as to frequency and duration of such work to compute back wages." (*Id*. at p. 19). The Court fails to see how employees working consecutive shifts negates the reasonableness of the inference to be drawn from DOL's evidence. To use Jon Heckler as an example, DOL is using the 911 records to deduct an average sleep time credit of eight hours from each of Jon Heckler's 24-hour shifts. (Docs. 34-14; 34-19). By deducting eight hours from each of Jon Heckler's shifts, DOL determines that Heckler worked 48 hours each week. The fact that Jon Heckler (or any employee) worked consecutive shifts is immaterial as it does not impact the average sleep time credit, and DOL is not seeking back wages for the time employees worked beyond the end of their scheduled shifts as a result of the 911 calls. Even if the Court misunderstands Defendants' consecutive shift argument, Defendants' own lack of recordkeeping allowed DOL to utilize 911 records to determine the average sleep time interruptions.

### 5. *Existence of Implicit Agreements*

Defendants also maintain "[t]here is a fact question regarding whether an implicit agreement existed in this case regarding the various terms of employment with Colyer's employees." (Doc. 43, p. 5). Defendants note that "there is conflicting evidence in the record regarding whether objections were raised, and if they were, whether such objections were sufficient to preclude a finding of an agreement." (*Id*.). Defendants then point out that "Colyer denies the employees voiced any objections." (*Id*.).

This argument is unclear. If Defendants are arguing that they had an implicit agreement which excuses them from paying overtime, then Defendants' argument is a

loser. To the extent Defendants are arguing they had an implied agreement to exclude a certain amount of hours of sleep time beyond eight hours from each employees' 24-hour shifts, Defendants' argument again fails because the FLSA only permits employers to take a sleep credit of up to eight hours. *See Walling v. Youngerman-Reynolds Hardwood Co.*, 325 U.S. 419, 424 (1945) ("[employers] [and] [employees] may agree to pay compensation according to any time or work measurement they desire . . . [b]ut this freedom of contract does not include the right to compute the regular rate in a wholly unrealistic and artificial manner so as to negate the statutory purposes"). If Defendants are arguing that they had implicit agreements where interrupted sleep time was not counted as hours worked, then this argument is a loser too. *See* 29 C.F.R. § 785.22(b) ("[i]f the sleeping period is interrupted by a call to duty, the interruption must be counted as hours worked. If the period is interrupted to such an extent that the employee cannot get a reasonable night's sleep [at least 5 hours' sleep], the entire period must be counted."). [4]

6. *Testimony with Respect to Linda Valleroy and 29 C.F.R. § 785.23*

There is no conflicting testimony with respect to Linda Valleroy. According to Defendants, "[n]ot only are the facts as to Ms. Valleroy disputed, but the DOL's position

---

[4] "Section 7(f) is the only provision of the Act which allows an employer to pay the same total compensation each week to an employee who works overtime and whose hours of work vary from week to week." 29 C.F.R. § 778.403. For Section 7(f) to apply, "such employee is employed pursuant to a bona fide individual contract, or pursuant to an agreement made as a result of collective bargaining by representatives of employees, if the duties of such employee necessitate irregular hours of work, and the contract or agreement (1) specifies a regular rate of pay of not less than the minimum hourly rate provided in subsection (a) or (b) of section 206 of this title (whichever may be applicable) and compensation at not less than one and one-half times such rate for all hours worked in excess of such maximum workweek, and (2) provides a weekly guaranty of pay for not more than sixty hours based on the rates so specified." 29 U.S.C.A. § 207. Defendants not only fail to provide bona fide individual contracts, but also many of the employees worked over sixty hours per week. Additionally, Defendants fail to provide evidence of irregular working hours. Accordingly, Section 7(f) does not apply.

ignores and is contrary to 29 C.F.R. § 785.23." (Doc. 43, p. 6). Defendants point to Colyer's testimony that Valleroy worked for five days a week generally from 8:00 a.m. to 6:00 p.m. (Doc. 32-1, pp. 19-20). Defendants also rely on Colyer's testimony to argue that Valleroy only worked eight hours a week starting in 2019. (*Id*. at p. 20).

Again, Defendants fail to meet their burden. DOL's evidence consists of Valleroy's timesheets and two declarations. Valleroy's timesheets show that she did not start working eight hours a week until 2020. (Doc. 33-10, pp. 41-46). Arthur Kaczynski's declaration explains that "a dispatcher was working at all times [and] [g]enerally, Linda Valleroy worked at SCAS." (Doc. 34-21, p. 3). Laurie Lentz's declaration notes "[t]he other SCAS dispatcher was Linda Valleroy [and] [s]he typically worked five 24-hour shifts per week." (Doc. 34-22, p. 2). Defendants do not attack DOL's evidence nor do Defendants negate the reasonableness of using Valleroy's timesheets.[5]

29 C.F.R. § 785.23 does not relieve Defendants' duty to pay Valleroy overtime. Under 29 C.F.R. § 785.23, "[a]n employee who resides on his [or] [her] employer's premises on a permanent basis or for extended periods of time is not considered as working all the time he [or] [she] is on the premises." Defendants use this regulation to argue "[i]t is clear that DOL disregarded [Valleroy's] agreement and disregarded 29 C.F.R. § 785.23 because its calculations reflect its conclusion that Valleroy was working *all the time she was living on the premises* and based its calculations on an 80 hour workweek

---

[5] Indeed, Colyer's declaration concedes that "[m]ost employees worked 24 hour shifts and worked a set schedule." (Doc. 44-4, p. 3).

by using *five 24-hour days* with an 8 hour sleep allowance." (Doc. 43, p. 6) (emphasis added).

DOL's calculations do not reflect that Valleroy was working all the time she was living on the premises. If DOL did, then its calculations would have included *seven 24-hour days*. Besides DOL's calculations not including seven 24-hour days, there must be a "reasonable agreement of the parties which takes into consideration all of the pertinent facts . . ." 29 C.F.R. § 785.23. Setting aside the fact there is no written agreement in the record, Defendants have not established that it took into account the number of hours actually worked by Valleroy, whether the number of overtime hours is pertinent, or whether Valleroy lived on the premises five or seven days a week. *See Leever v. Carson City*, 360 F.3d 1014, 1019 (9th Cir. 2004) (noting that "[t]he cases interpreting the regulation, however, suggest that, at a minimum, an agreement must take into account some approximation of the number of hours actually worked by the employee or that the employee could reasonably be required to work"). "As the party seeking the benefit of section 785.23, [Defendants] bear[ ] the burden of proving that the employment agreement at issue was reasonable." *Garofolo v. Donald B. Heslep Assocs., Inc.*, 405 F.3d 194, 199–200 (4th Cir. 2005). Because Defendants have not met that burden, the Court cannot hold that Valleroy's agreement was reasonable, and Defendants will not benefit from 29 C.F.R. § 785.23.

### B. Liability as to Work During Meal Periods

DOL's overtime claim is also based on the notion that employees regularly worked during their meal periods. The problem is DOL's motion for summary judgment fails to

provide evidence supporting the notion that employees' meal periods were spent predominantly for the benefit for the employer. (Doc. 31). Indeed, to determine whether meal periods are work, the Seventh Circuit has adopted the predominant benefits test. *Barefield v. Vill. of Winnetka*, 81 F.3d 704, 710 (7th Cir. 1996) (citing *Alexander v. City of Chicago*, 994 F.2d 333, 337 (7th Cir. 1993)). "Under this test, a meal period is not work time if 'the employee's time is not spent predominantly for the benefit of the employer.'" *Id.* (quoting *Alexander*, 994 F.2d at 337).

DOL presents general evidence about the meal period policy through Colyer's testimony and one employee declaration stating he "did not have a designated uninterrupted meal time." (Doc. 34-23, p. 2). When asked whether employees are officially allotted 30 minutes or an hour, Colyer answered:

> They usually do it—you know, they usually eat breakfast between 8:00 to 12:00. Most have dinner between 12:00 and 6:00 and they have dinner 5:00 to midnight, but I don't restrict them on certain times to eat. They might sit there for two hours and they won't have a call.

(Doc. 32-1, pp. 39-40). Meal periods neither have to be scheduled nor occur at a regular time to be "bona fide." *See Bates v. Dep't of Corr. of State of Kan.*, 81 F.3d 1008, 1012–13 (10th Cir. 1996) (finding "no case which holds that in order for a meal period to be a bona fide meal time under 29 C.F.R. § 785.19 it must be 'scheduled' and 'occur at a regular time,' and [ ] declin[ing] to judicially insert that language into the regulation"); *Dean v. Akal Sec., Inc.*, 3 F.4th 137, 146 (5th Cir. 2021) ("[t]his court has not suggested since *Lee* that a regular schedule for meals is required."); *see also White v. Baptist Mem'l Health Care Corp.*, 699 F.3d

869, 873 (6th Cir. 2012) ("[a]n automatic meal deduction system is lawful under the FLSA").

Investigator Carlen also notes that "[m]eal breaks were not deducted because the employees did not have regular meal periods and *Defendants stated meals periods were paid*." (Doc. 34-14, p. 9) (emphasis added). The fact that meal periods were paid has already been rejected by the Seventh Circuit in *Barefield*:

> Plaintiffs last argue that meal periods must be compensated periods for purposes of the FLSA because all plaintiffs are in fact paid for the meal periods. Plaintiffs argue that Winnetka's voluntary payment for meal periods transforms FLSA defined non-"work" time into FLSA defined "work" time—that is, paid time equals "work" time. We disagree. The FLSA sets a floor, not a ceiling, on compensation that employees must receive. Nothing in the statute, regulations, or the case law prevents an employer from compensating its employees for a full forty hour week even though they worked *less* than that amount. *See* 29 C.F.R. § 553.223(b) (noting that a public agency invoking a 7(k) partial overtime exception "*may* ... exclude meal time hours from hours worked"). The FLSA prohibits an employer from failing to compensate for "work" in excess of forty hours per week. The meal periods were not "work." Therefore, plaintiffs fail to establish an FLSA violation.

81 F.3d at 711.

Unlike DOL's use of 911 records for average sleep time interruptions, DOL does not use 911 records to develop average meal period interruptions. DOL also does not addresses whether employees were allowed to make up missed meal periods. Further, DOL does not demonstrate that Defendants had requisite knowledge that employees worked during their meal periods.

At *best*, the Court needs more facts about the degree of interruption to meal periods to determine whether employees' meal periods were predominately for

Defendants' benefit, and summary judgment as to the meal period issue must be denied. At *worst*, DOL has raised a new theory of liability as to overtime violations. [6] Accordingly, summary judgment is not appropriate as to DOL's overtime claims based on the notion that employees regularly worked during their meal periods.

## IV.   Minimum Wage

DOL argues "Defendants failed to pay three employees the minimum wage because the lump sum they received, divided by hours worked, did not cover the federal minimum wage." (Doc. 31, p. 16). The problem is the hours worked, like DOL's overtime hours calculation, did not deduct for meal periods. Because a genuine dispute regarding employees spending their meal periods predominately for Defendants' benefit remains, summary judgment as to Defendants' minimum wage violations must be denied.

## V.   Three Year Statute Of Limitations Under 29 U.S.C. § 255(A)

Actions for violations of the FLSA's overtime, minimum wage, or liquidated damages provisions "shall be forever barred unless commenced within two years after the cause of action accrued, except that a cause of action arising out of a *willful* violation

---

[6] The Seventh Circuit has acknowledged that the principles that apply to pleading overtime violations are the same principles that apply to minimum wage violations. *Hirst v. Skywest, Inc.*, 910 F.3d 961, 966 (7th Cir. 2018). The Court noted that "[i]n order to comply with the requirements of *Twombly*, *Iqbal*, and FED. R. CIV. P. 8(a)(2), a plaintiff alleging a federal minimum wage violation must provide sufficient factual context to raise a plausible inference there was at least one workweek in which he or she was underpaid." *Id.* Similarly, a plaintiff alleging a federal overtime violation must provide sufficient factual context to raise a plausible inference there was at least one workweek in which he worked in excess of forty hours and were not paid overtime wages. Here, DOL's complaint only alleged that "Defendants failed to compensate their dispatchers, EMTS, and paramedics for all hours worked when employees' sleep band was interrupted, resulting sleep of less than eight (8) hours a night [and] Defendants also paid employees a flat shift rate or salary, regardless of hours worked, resulting in a failure to properly count and properly compensate hours worked in excess of 40 in a workweek." (Doc. 1, p. 4). The complaint does not allege that employees worked through their meal periods.

may be commenced within three years after the cause of action accrued." 29 U.S.C. § 255. (emphasis added). In order to show "willfulness," a plaintiff must show "that the employer either knew or showed *reckless disregard* for the matter of whether its conduct was prohibited by the [FLSA]." *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133 (1988) (emphasis added). "'[W]illful' is considered synonymous with words such as 'voluntary,' 'deliberate,' and 'intentional.'" *Sampra v. United States Dep't of Transp.*, 888 F.3d 330, 333 (7th Cir. 2018) (citing *McLaughlin,* 486 U.S. at 133). The Code of Federal Regulations defines reckless disregard as the "failure to make adequate inquiry into whether conduct is in compliance with the Act." 5 C.F.R. § 551.104.

According to the DOL, "Defendants were fully aware of FLSA's requirements, having been previously investigated for similar violations involving the payments of salaries to non-exempt employees." (Doc. 31, p. 17). DOL provides the Court a consent judgment where Defendants previously agreed to not violate the minimum wage, overtime, and recordkeeping provisions of the FLSA. (Doc. 34-16, p. 3). Also, back in September 2001, Investigator Yochim provided Defendants with specific instructions to record employees' sleep time interruptions. (Doc. 34-17).

Defendants argue that the prior investigation does not render their actions in this case willful because "the prior DOL investigation involved the mis-classification of employees as exempt versus non-exempt." (Doc. 43, p. 7). Defendants contend that "[t]he issue in the current investigation, 20 years later is not one of mis-classification, but rather one involving Colyer's alleged failure to pay his employees minimum wage and

overtime." (*Id.* at p. 8). Defendants also attempt to create a disputed fact as to Defendants' willfulness by pointing to certain sections of Colyer's testimony.

Framing the prior DOL investigation as involving "mis-classification" is unpersuasive. Indeed, the consent judgment from the prior investigation ordered "Defendants [ ] [to] pay to the Plaintiff the sum of $20,000.00 which represents the *unpaid minimum wage and overtime compensation hereby found to be due, for the period March 1, 1996 through November 26, 1999*, to the present and former employees named in Exhibit A, attached hereto and made a part thereof, in the amounts set forth therein." (Doc. 34-16, p. 4) (emphasis added). In other words, the prior investigation, like the current investigation, involved alleged failure to pay employees a minimum wage and overtime compensation.

Colyer's testimony is even worse for Defendants as it establishes that Colyer knew what he had to do, but still chose not to record sleep time interruptions. (Doc. 32-1, p. 54). Specifically, Colyer testified, in part:

> **Colyer:** I requested a letter from [Yochim] that you received there describing how he wanted the pay to be done going forward.
>
> **Q:** And do you believe you followed that letter?
>
> **Colyer:** *I could have*—that I could have tried to get the employees to fill out their time sheets and fill out their call backs.

(Doc. 44-2, pp. 51-52) (emphasis added). The letter from Yochim specifically explained, in part:

> Due to the nature of the paramedic industry, your employees are required to record any interruptions to their designated sleep period. *Consequently, if employees receive a call-out during the designated sleep period of 11:00 p.m. to*

> *7:00 a.m., they are to record the date the call was received, the time the call was received, the destination(s) of the call, and the time they return to base. This information will need to be recorded for each and every call-out received by an employee.* If manual time sheets are still used at your business, an easy and effective location to record this information is on the back or the reverse side of the time sheet.

(Doc. 34-17) (emphasis added).

Overall, the prior consent judgment, Colyer's testimony, and the September 2001 letter demonstrate that the recordkeeping and overtime violations were willful because Defendants had actual notice of their obligations under the FLSA. *See e.g., Scalia v. Ghosn*, 451 F. Supp. 3d 1215, 1225 (W.D. Okla. 2020) (noting that defendant's previous FLSA violations "demonstrate that the minimum wage, overtime, and recordkeeping violations were willful because [defendant] had actual notice of his obligations under the FLSA as to the very issues involved here"); *Chao v. A-One Med. Servs., Inc.*, 346 F.3d 908, 919 (9th Cir. 2003) (acknowledging that "that [defendant] previously had run-ins with the Labor Department certainly put [defendant] on notice of other potential FLSA requirements"). Accordingly, summary judgment is granted as to the willfulness of the § 207 and § 215(a)(2) claims,[7] and Defendants' employees are entitled to back wages for unpaid compensation beginning in the period of December 1, 2017.[8]

## VI.    Liquidated Damages

If an employer fails to properly pay minimum wages and overtime, then the employer is liable for liquidated damages in an amount equal to the amount of back

---

[7] Except the portion of the overtime claim based on the notion that employees regularly worked during their meal periods.

[8] The case was filed on December 1, 2020.

wages. 29 U.S.C. § 216(b). "That statute makes liquidated damages mandatory unless the district court finds that the defendant-employer was acting in good faith and reasonably believed that its conduct was consistent with the law." *Shea v. Galaxie Lumber & Const. Co.*, 152 F.3d 729, 733 (7th Cir. 1998) (citing 29 U.S.C. § 260). "Doubling is the norm, not the exception . . . ." *Id.* (citing *Avitia v. Metro. Club of Chicago, Inc.*, 49 F.3d 1219, 1223 (7th Cir. 1995)).

To avoid liquidated damages, "[t]he employer bears the burden of proving both good faith and reasonable belief." *Id.* (citing *Bankston v. State of Ill.*, 60 F.3d 1249, 1254 (7th Cir. 1995)). Notably, "[i]t is easier for a plaintiff to receive liquidated damages under the FLSA than it is to extend the statute of limitations for FLSA claims . . . ." *Bankston*, 60 F.3d at 1254 (citing *Walton*, 786 F.2d at 312).

Defendants cannot establish good faith as required for a reduction in liquidated damages because their FLSA violations were willful as a matter of law. For the reasons discussed below, neither 29 C.F.R. § 778.309, Colyer's testimony, nor Colyer's efforts establish good faith or show a reasonable belief when considering the prior FLSA investigation involving Defendants' failure to pay employees overtime.

    *i.*    *29 C.F.R. § 778.309*

According to Defendants, they chose to pay a fixed rate for a fixed amount of overtime. (Doc. 43, p. 10). Defendants note that "[t]he time sheets submitted by the employees show they worked 8 a.m. to 8 a.m. [and] [t]hose same employees did not object to the method or calculation of their pay over the course of more than ten years, until the current investigation." (*Id.*). Defendants then assert that "Colyer's pay practice [ ]

arguably aligns with 29 C.F.R. § 778.309 which permits an employer to pay a fixed sum for a constant amount of overtime work." (*Id.*).

Under 29 C.F.R. § 778.309, "[w]here an employee works a regular fixed number of hours in excess of the statutory maximum each workweek, it is, of course, proper to pay him, in addition to his compensation for nonovertime hours, a fixed sum in any such week for his overtime work, determined by multiplying his overtime rate by the number of overtime hours regularly worked." The problem with Defendants' argument is that it ignores DOL's evidence that employees did not work a fixed amount of overtime hours. Overtime hours varied because sleep time interruptions varied. Accordingly, the Court rejects this argument.

ii.    *Colyer Consulted with the Wage and Hour Division*

Defendants again point to Colyer's testimony where he talked to Yochim, Jeff Fisher ("Fisher"), and Dean Campbell ("Campbell") from the Wage and Hour Division. These conversations fail to establish good faith or a reasonable belief.

Colyer last talked to Yochim in "probably 2001, 2002." (Doc. 44-2, p. 48). Colyer testified that Yochim told him that he could deduct a sleep time credit of eight hours and three hours for meal periods from each employee's 24-hour shift. (*Id.* at pp. 49-50). The problem is Yochim's September 2001 letter provided Defendants with specific instructions to record employees' sleep time interruptions. (Doc. 34-17). Colyer admitted that sleep time interruptions were not recorded. (Doc. 32-1, p. 54). Colyer even confessed that he knowingly failed to follow Yochim's letter because his employees did not fill out their time sheets and their call backs. (Doc. 44-2, pp. 51-52). The September 2001 letter

and Colyer's admission undermine Defendants' good faith argument as to Colyer's conversations with Yochim.

Additionally, Colyer's alleged conversations with Fisher fail to establish good faith or a reasonable belief. Colyer testified that he last spoke to Fisher in the late '90s. (*Id.* at p. 48). As a result, even if Fisher looked at Colyer's timesheets and did not see any problems, it would be insignificant because Colyer later clarified his duties with Yochim, who provided Colyer with specific instructions.

Colyer's alleged conversations with Campbell fail to establish good faith or a reasonable belief. Colyer's testimony includes:

**Q:** How many times do you think you spoke to Dean Campbell?

**Colyer:** Probably two to three times.

**Q:** And each of those times was to clarify what [Yochim] had told you?

**Colyer:** The first time was during the [prior] investigation. I wanted to make sure I was doing things right going forward. It took a fairly long period of time. It went from like '98 to 2000. And I talked to him, like I said, two to three times during that time period.

**Q:** Were the other times after the investigation?

**Colyer:** I believe the last time was probably around 2002. I requested a letter from [Yochim] that you received there describing how he wanted the pay to be done going forward.

**Q:** And do you believe you followed that letter?

**Colyer:** *I could have*—that I could have tried to get the employees to fill out their time sheets and fill out their call backs.

(*Id.* at pp. 51-52) (emphasis added). Even though Colyer wanted to confirm with Campbell that he was doing the right thing going forward, Colyer <u>again</u> admits that he

knowingly disobeyed Yochim's letter and blames his refusal on his employees' failure to fill out time sheets or write down their sleep time interruptions. "[T]he law requires more, namely that Defendants 'then act to comply with [their obligations under the FLSA].'" *Scalia v. Liberty Gas Station & Convenience Store, LLC*, 444 F. Supp. 3d 390, 407 (N.D.N.Y. 2020) (quoting *Herman v. RSR Sec. Servs. Ltd.*, 172 F.3d 132, 142 (2d Cir. 1999)).

   iii.   *Colyer's Efforts*

Finally, Defendants spill a considerable amount of ink to Colyer's efforts. Defendants note "[a]t one point [Colyer] stopped tracking sleep time interruptions and paid his 24 hour employees for every hour of their shift" (Doc. 43, p. 8). Defendants also note that "[a]t another point, to address the DOL criticism that he needed to pay for sleep time interruption, [ ] [began] excluding sleep time of 8 hours as permitted, but then gave a 2-hour credit for each 24-hour employee to account for average sleep time interruption." (*Id.*).

These efforts neither establish good faith nor a reasonable belief that Defendants' conduct was consistent with the law. The overwhelming evidence establishes that Defendants knew they had to deduct actual time spent on emergency calls during sleep time, but Defendants refused to do so. (Doc. 32-1, p. 53).

## VII.   Injunctive Relief

DOL requests an injunction "enjoining and restraining Defendants, their officers, agents, servants, employees, and those persons in active concert or participation with them from prospectively violating the Act." (Doc. 1, p. 5). Under 29 U.S.C. § 217, district courts may restrain violations of FLSA's overtime, minimum wage, and record-keeping

provisions. "An injunction is appropriate after FLSA violations are established if 'there are insufficient assurances that defendants will comply with the FLSA in the future.'" *Perez v. Super Maid, LLC*, 55 F.Supp.3d 1065, 1080 (N.D. Ill. 2014) (quoting *Solis v. Int'l Detective & Protective Serv., Ltd.*, 819 F.Supp.2d 740, 754 (N.D. Ill. 2011)). Absent "recognized mitigating factors," DOL is entitled to an injunction upon proof of violations. *Walling v. Nat'l Ice & Fuel Corp.*, 158 F.2d 28, 29 (7th Cir. 1947).

DOL argues "an injunction is necessary against Defendant Colyer and WCAS because, even after being made aware of their violations in the late 1990s, and again after being made aware of their violations in 2019, they failed to correct their violative practices, instead creating various 'schemes' to avoid liability." (Doc. 31, p. 20). Defendants neither offer any facts establishing any type of mitigation nor argue against an injunction. Even if Defendants did, the Court has little confidence that Defendant Colyer and WCAS will comply with the FLSA going forward. Colyer asserts that starting in early 2019 he started "figuring all their pay to the exact penny[,]" (Doc. 32-3, p. 43), but Colyer continued to not record sleep time interruptions. Then, even after the WHD initiated this recent investigation, Colyer and WCAS continued to fail to keep the basic employment records required by the FLSA. (Docs. 34-12; 34-13). Accordingly, the Court will issue an injunction restraining Defendant Colyer and WCAS[9] from violating 29 U.S.C. § 211(c) and § 29 U.S.C. 207 by failing to compensate for sleep interruptions and failing to properly count and compensate hours worked.

---

[9] Again, SCAS ceased operating in August 2021. (Doc. 32-1, p. 8).

CONCLUSION

For these reasons set forth above, the Motion for Summary Judgment filed by Plaintiff Martin J. Walsh, Secretary of Labor for the United States Department of Labor (Doc. 30) is **GRANTED in part and DENIED in part**. The motion is **GRANTED** as to (1) DOL's claims pursuant to 29 U.S.C. §§ 11(c) and 15(a)(5); (2) DOL's claims pursuant to 29 U.S.C. §§ 207 and 15(a)(2), except overtime claims based on the notion that employees regularly worked during their meal periods; (3) the willfulness of these aforementioned violations; (4) the appropriateness of liquidated damages as to the aforementioned violations; and (5) DOL's request for injunctive relief as to the aforementioned violations.

The motion is **DENIED** as to (1) DOL's claims pursuant to 29 U.S.C. §§ 207 and 15(a)(2) based on the notion that employees regularly worked during their meal periods; (2) DOL's claims pursuant to 29 U.S.C. §§ 206 and 15(a)(2); (3) the willfulness of 29 U.S.C. §§ 207, 206, 15(a)(2) based on the notion that employees regularly worked during their meal periods; and (4) the appropriateness of liquidated damages as to the alleged violations of 29 U.S.C. §§ 207, 206, 15(a)(2) based on the notion that employees regularly worked during their meal periods.

The Court **FURTHER ORDERS** that Defendant Colyer and WCAS are hereby permanently enjoined from continued violation of the overtime and record-keeping provisions of the Fair Labor Standards Act, and from withholding unpaid compensation adjudicated herein.

Pursuant to *MillerCoors LLC v. Anheuser-Busch Companies, LLC*, 940 F.3d 922 (7th Cir. 2019), the Court will enter the terms of the injunctive relief set forth above in a separate document.

      **IT IS SO ORDERED.**

      **DATED:  June 27, 2022**

                                      **NANCY J. ROSENSTENGEL**
                                      **Chief U.S. District Judge**